IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DIRT PLUS, INC.                    *

        Plaintiff           *

        vs.                 *    CIVIL ACTION NO. MJG-03-1158

JOLLAR, INC., et al.               *

                             *

        Defendants
*     *     *     *     *     *     *     *     *

## MEMORANDUM OF DECISION

    This case was tried before the Court without a jury.  The Court has heard the evidence, reviewed the exhibits, considered the materials submitted by the parties, and had the benefit of the arguments of counsel.  The Court now issues this Memorandum of Decision as its findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.  The Court finds the facts stated herein based upon an evaluation of the evidence, including the credibility of witnesses and those inferences that the Court has found reasonable to draw from the evidence.

I.   INTRODUCTION

    A.   The Parties

    Starting about 1986, Jollar, Inc. ("Jollar"), a Maryland corporation, engaged in the business of residential construction.

At all times relevant hereto, Jollar was operated by Earl C.
Sollars, Jr. ("Sollars").  Until January 31, 2000, Jollar was
owned by Sollars and his long term (18 years or so) girlfriend,
Defendant Josselle B. Gatrell ("Gatrell").  At the end of 2000,
Gatrell relinquished her shares in Jollar, leaving Sollars as the
sole shareholder.

At all times relevant hereto, Plaintiff Dirt Plus, Inc.
("Dirt Plus") has been engaged in the business of providing
services relating to construction sites.

At all times relevant hereto, Severn Savings Bank (the
"Bank") has been engaged in the banking industry, including the
business of providing construction and other loans.  Over the
years, the Bank regularly engaged in transactions with, and
relating to, Sollars.

Defendant Jo-Lar Construction, Inc. ("JCI") is a Maryland
corporation that was incorporated by Gatrell in September, 2001.
As discussed herein, JCI was utilized to facilitate the transfer
of assets from Jollar so as to evade Jollar's obligations to its
creditors.

B.   <u>The Underlying Dirt Plus Debt</u>

In 1999 and 2000, Dirt Plus provided Jollar with services and supplies in connection with a construction project at the Running Cedars subdivision in Lothian, Anne Arundel County, Maryland.  Jollar did not fully pay Dirt Plus the money it was due.

On July 3, 2000, Dirt Plus sued Jollar in the Circuit Court for Anne Arundel County, Maryland, seeking damages of $192,536.21, plus costs, interest and attorney's fees.  At a hearing on August 23, 2000, Sollars advised the Circuit Court that he and Jollar would agree to settle with Dirt Plus in the amount of $152,334.18 and that Jollar and Sollars (personally) would execute a confessed judgment note to be held in escrow until default upon the settlement agreement (the "Settlement Agreement").  The documents were executed the next day.

Jollar and Sollars promptly defaulted.  On October 10, 2000, Dirt Plus sued on the confessed judgment note in the Circuit Court for Anne Arundel County, Maryland (the "Confessed Judgment Case").  The next day, a Judgment ("the Judgment") was entered in favor of Dirt Plus, Inc. and against Jollar and Sollars in the amount of $152,334.18, plus costs, interest, and attorney's fees.

C.   <u>Dirt Plus Collection Efforts</u>

Promptly after entry of the Judgment, Dirt Plus, through its counsel Annette DeCesaris ("DeCesaris"), vigorously sought collection of the debt.  DeCesaris actively utilized garnishments and other legal means to attempt collection.  DeCesaris's efforts made it, no doubt, inconvenient for Sollars to continue to conduct Jollar's business.  Sollars, in concert with Gatrell, therefore, sought to evade Dirt Plus' collection efforts and Jollar's obligations to other creditors.

In the Fall of 2001, Jollar was constructing several homes for customers utilizing various subcontractors' services.  Thus, customers were making progress payments to Jollar and these funds, in turn, were used to operate the corporation.  Sollars wished to keep the Jollar corporate cash flow "safe" from Dirt Plus.  Initially, he did so by simply endorsing customers' checks payable to Jollar so as to obtain cashier's checks (or the like) payable to selected subcontractor and/or suppliers' payments. Sollars found, however, that it was difficult to operate the Jollar business without using a bank account.  Therefore, Sollars, together with Gatrell, took checks totaling $458,000 payable to Jollar and used it for their personal benefit.  Thus, as discussed below, funds represented by checks payable to Jollar

4

were used for purchase of a residential lot and construction of a
home for Sollars and Gatrell to be held in Gatrell's name.

### D.   Procedural Posture

On January 22, 2002 Dirt Plus filed the instant lawsuit
against Jollar, Sollars, Gatrell, and others in the Circuit Court
for Anne Arundel County, Maryland.  During the pendency of the
case Jollar, Sollars, and Gatrell filed individual bankruptcy
petitions.  Sollars filed under Chapter 7 on February 27, 2002.
Jollar filed under Chapter 7 on March 21, 2003; thereafter, Sean
C. Logan ("the Trustee") was appointed Chapter 7 Trustee of the
Bankruptcy Estate of Jollar, Inc. ("the Estate").

On April 18, 2003 the instant case was removed to this
Court.  Then, on October 10, 2003, Gatrell filed a bankruptcy
petition under Chapter 13.

On February 27, 2004, a settlement between the Trustee and
Dirt Plus was approved by this Court.  As a result, Dirt Plus
assigned its claims asserted herein to the Trustee.  Accordingly,
the Trustee is proceeding on the Dirt Plus claims as assignee and
on Jollar's own claims.

II.   DISCUSSION

    A.   <u>Jollar Funds</u>

        1.   <u>The Diversion Scheme</u>

Sollars and Gatrell wished to build a residence on a lot owned by Jollar using subcontractors working for Jollar.  They faced a problem in achieving their objective because Jollar was unable to pay its creditors in full and Dirt Plus was engaging in aggressive collection efforts.  Therefore, they agreed to engage in a scheme to take checks payable to Jollar for their own use.

To carry out the scheme, Gatrell formed a corporation named "Jo-Lar Construction, Inc." ("JCI") to open a bank account to receive Jollar's funds.  By using the name "Jo-Lar Construction, Inc." Gatrell made it appear that the account was related to "Jollar, Inc."  Therefore, customers who issued checks to Jollar and became aware that their checks were deposited in an account held in the name "Jo-Lar Construction, Inc." would have the impression that they were essentially continuing to deal with Jollar.

Checks payable to Jollar were deposited into Gatrell's account in the name of JCI.  The funds obtained from these checks, totaling $458,000, were used, among other things, to purchase a residential lot for Gatrell, to facilitate the use of Jollar subcontractors to work on the construction of a residence

6

on Gatrell's lot and to pay at least some of the construction costs of the residence.  While some portion of the funds may have been used to pay debts owed by Jollar, such payments primarily were made so as to benefit Gatrell and Sollars by maintaining a working relationship with subcontractors and/or suppliers who would be providing goods and services in connection with the construction of Gatrell's residence.   The Trustee seeks to recover the $468,000 from Gatrell.[1]


   2.  Liability for the Diverted Funds

   Section 544 of the Bankruptcy Code provides the Trustee with creditor standing for the purpose of avoiding fraudulent conveyances under state law.[2]  11 U.S.C. § 544(b)(1).  The Trustee contends that the diversion of checks payable to Jollar in the total amount of $458,000 was a "conveyance made ...with actual intent... to hinder, delay or defraud present or future creditors" and should be avoided pursuant to § 15-207 of the Commercial Law Article.

───────────────

   [1] Neither Sollars nor JCI appears to provide a realistic source for collection.

   [2] 11 U.S.C. §544(b)(1)provides that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502."

In Maryland law:

> Every conveyance made and every obligation
> incurred by a person who is or will be
> rendered insolvent by it is fraudulent as to
> creditors without regard to his actual intent
> if the conveyance is made or the obligation
> is incurred without a fair consideration.
> MD. CODE ANN., COM. LAW II § 15-204 (2000).

> \* \* \*

> Every conveyance made and every obligation
> incurred with actual intent, as distinguished
> from intent presumed in law, to hinder,
> delay, or defraud present or future
> creditors, is fraudulent as to both present
> and future creditors.  MD. CODE ANN., COM. LAW
> II § 15-207 (2000).

The party attempting to avoid a conveyance has the burden of proving that the conveyance was fraudulent.  Berger v. Hi-Gear Tire & Auto Supply, Inc., 263 A.2d 507, 509 (Md. 1970).   It is well established that intent can be shown by reference to "the various facts and incidents composing the transaction[] and its environment."  Id. (citing McCauley v. Shockey, 66 A. 625, 626 (Md. 1907)).

In determining whether evidence of fraud on the part of the grantee has been presented, Maryland courts have considered such facts as the "insolvency or indebtedness of the transferor, lack of consideration for the conveyance, the relationship between the transferor and the transferee, the pendency or threat of

8

litigation, secrecy or concealment, departure from the usual method of business, the transfer of the debtor's entire estate, the reservation of some benefit to the transferor, and the retention by the debtor of possession of the property." <u>Berger</u>, 263 A.2d at 511.  <u>See also</u> <u>A.V. Laurins & Co. v. Prince George's County</u>, 420 A.2d 982, 987 (Md. App. 1980).  Alone, no single factor proves fraud; however, such a fact or circumstance can "warrant an inference of fraud, especially where several of the indicia concur."  <u>A.V. Laurins & Co.</u>, 420 A.2d at 988.

In the instant case, there is no doubt that the Trustee has proven the fraudulent transfer of $458,000 from Jollar and that both Sollars and Gatrell were aware of, and participated in, the fraud.

The evidence presents classic indicia of fraud as recognized in Maryland Law.  <u>See</u> <u>Berger</u>, 263 A.2d at 510; <u>Wellcraft Marine Corp. v. Roeder</u>, 550 A.2d 377, 379 (Md. 1988)(delineating the factors which indicate fraud).  For example:

> 1.  <u>Debtor Insolvency</u> - Jollar's assets were not sufficient to pay its liabilities as they became due.  The diversion of $458,000 of Jollar's cash rendered the insolvency even worse.
>
> 2.  <u>Lack of Consideration</u> - There was no consideration whatsoever for the funds that were diverted from Jollar to Gatrell's account in the name of JCI.
>
> 3.  <u>Transferor/Transferee Relationship</u> - Gatrell, the sole shareholder of JCI, and Sollars, the sole

9

shareholder of Jollar, had a close personal relationship for some eighteen years and were, in effect and reality, partners in the scheme.

4.   <u>Threat of Litigation</u> - Dirt Plus, by DeCesaris, was actively pursuing legal collection remedies.

5.   <u>Secrecy</u> - Jollar's creditors, particularly Dirt Plus, were kept in the dark regarding the diversion of Jollar's corporate funds.

6.   <u>Departure From Usual Business Methods</u> - The transaction was highly unusual.

7.   <u>Transfer of Estate</u> - The purpose of the overall scheme was to divert Jollar's cash for the benefit of Gatrell and her co-conspirator, Sollars.

8.   <u>Reservation of Benefit by Transferor</u> - Sollars, by virtue of his continuing personal relationship with Gatrell, essentially reserved the benefit of the funds transferred.  Sollars and Gatrell used the money to buy property and build a home for Gatrell.

9.   <u>Retention by the Debtor of Possession</u> - Through the scheme Sollars and Gatrell kept control and use of the funds.

The defendants have not, by any means, refuted the clear proof presented by the Trustee.  The Court finds, without doubt, that the Trustee has established that the diversion of $458,000 of checks payable to Jollar to an account in JCI's name was a fraudulent transfer that the Trustee is entitled to avoid.  Thus, without question, the Trustee is entitled to recover from JCI. It is, therefore, necessary to consider whether the Trustee can recover from Gatrell.

10

3.    Personal Liability

(a)    Direct Personal Liability

As discussed above, Gatrell and Sollars agreed to act, and did act, in concert to take Jollar's funds for their personal benefit.  Under Maryland law, two or more persons are liable as conspirators if there was (1) a combination of two or more persons who agreed to accomplish an unlawful act; (2) the unlawful act was committed; and (3) a causal connection exists between the unlawful act and the damages to the Plaintiff. exists.  See Green v. Washington Suburban Sanitary Comm'n, 269 A.2d 815 (Md. 1970).

However, in Maryland, civil conspiracy is not recognized as an independent tort.  See Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc., 665 A.2d 1038, 1045 (Md. 1995).  The Court of Appeals has "consistently held that 'conspiracy' is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." Id. (quoting Alexander v. Evander, 650 A.2d 260, 265 n.8 (Md. 1994)(quotations omitted)).  Thus, in the instant case, the conspirators would be liable only if there were tortious injury to the Plaintiff as a result of the conspiracy.

In the instant case, there was injury to Jollar.  Jollar was the victim of a conversion of its checks[3] by the conspirators. Moreover, Jollar's creditors also were victims of the fraudulent conversion of checks payable to Jollar.  Accordingly, the Trustee can recover for the damages sustained by virtue of the conversion of the checks, that is a total of $458,000.

It is well established in Maryland law that the corporate shield of liability does not protect individuals from liability for their own personal actions.  As stated in <u>Tedrow v. Deskin</u>, 290 A.2d 799, 802 (Md. 1972), "[t]he general rule is that the corporate officers or agents are personally liable for those torts which they personally commit, or which they inspire or participate in, even though performed in the name of an artificial body."   In <u>Metromedia Co. v. WCBM Maryland, Inc.</u>, 610 A.2d 791 (Md. 1992) the Court of Appeals provided examples of this general rule.

> In <u>Tedrow</u>, an action for deceit, we
> reversed a summary judgment in favor of
> officers and employees of a corporation which
> sold a used car to the plaintiff who alleged
> that the officers and employees had knowledge

---

[3] A check may be the proper subject of a conversion action. <u>See</u> <u>Maryland Cas. Co. v. Wolff</u>, 25 A.2d 665, 665 (Md. 1942) ("Conversion of a check as a chattel, a tort, is, of course, the subject of the suit.  The money represented by it is not the direct subject, as trover does not lie to recover money converted; it lies to recover damages for the tort").

> that the odometer on the automobile he
> purchased from the corporation had been
> altered to reflect a lower mileage than the
> automobile had actually traveled.
>
> We applied the same principle in
> <u>Fletcher v. Havre de Grace Co.</u>, 229 Md. 196,
> 200-01, 177 A.2d 908, 910 (1962) where we
> held that the officer and director of a
> fireworks would be personally liable in
> action for trespass q.c.f. if they
> "<u>specifically directed, or actively</u>
> <u>participated or cooperated in</u>, a particular
> act of commission or omission that wrongfully
> triggered the series of explosions [which
> damaged plaintiff's property]." (emphasis in
> original).  And in <u>Levi v. Schwartz</u>, 201 Md.
> 575, 583-84, 95 A.2d 322, 327 (1953), we held
> that the president of a development
> corporation was personally liable for the
> corporation's tortious removal of lateral
> support from an adjacent landowner's lot of
> ground where the president daily visited the
> excavation underway on the corporation's land
> and supervised the operation. <u>See also</u> <u>Purdum</u>
> <u>v. Edwards</u>, 155 Md. 178, 186-87, 141 A. 550,
> 553-54 (1928) (president of real estate
> corporation held liable in an action of
> deceit by buyers of lot which was underwater
> but was represented by president of corporate
> seller as being "high and dry.") (Footnote
> omitted).

Accordingly, Gatrell[4] is liable to the Trustee for the

$458,000 value of the checks she and Sollars took from Jollar and

placed in an account in the name of JCI for her benefit.  Gatrell

would be, however, entitled to pursue claims in the Jollar

bankruptcy with regard to any funds that she personally expended,

---

[4]  As well as Sollars.

13

whether directly from the diverted funds or her separate assets,

to pay appropriate[5] debts of Jollar.


      (b)   <u>Piercing the Corporate Veil</u>

     As discussed above, the Court finds Gatrell personally

liable to the Trustee by virtue of her personal actions.   The

Court notes, however, that if it were necessary to do so, the

Court would pierce JCI's corporate veil to hold Gatrell

personally liable.

     As stated by the Maryland Court of Appeals in <u>Hildreth v.</u>

<u>Tidewater Equipment Co.</u>, 838 A.2d 1204 (Md. 2003), it remains the

law of Maryland that:

> although the courts will, in a proper case,
> disregard the corporate entity and deal with
> substance rather than form, as though a
> corporation did not exist ... shareholders
> generally are not held individually liable
> for debts or obligations of a corporation
> except where it is necessary to prevent fraud
> or enforce a paramount equity.[6]

<u>Id.</u> at 1209.

     The Maryland Court of Appeals further stated:

---

   [5]   The Bankruptcy Court, and not this Court, should
determine those Jollar debts as to which such a claim should be
allowed.

   [6] Quoting from <u>Bart Arconti & Sons v. Ames-Ennis</u>, 340 A.2d
225, 234 (Md. 1975).

In a number of cases including <u>Bart Arconti</u>,
we made favorable reference to the synthesis
supplied in the 1953 edition of Herbert
Brune's work, <u>Maryland Corporation Law and
Practice</u>, § 371, as to when a corporate
entity will be disregarded:

"<u>First</u>.  Where the corporation is used <u>as a
mere shield for the perpetration of a fraud</u>,
the courts will disregard the fiction of
separate corporate entity.

<u>Second</u>.  The courts may consider a
corporation as unencumbered by the fiction of
corporate entity and deal with substance
rather than form as though the corporation
did not exist, <u>in order to prevent evasion of
legal obligations</u>.

<u>Third</u>.  Where the stockholders themselves, or
a parent corporation owning the stock of a
subsidiary corporation, <u>fail to observe the
corporate entity, operating the business or
dealing with the corporation's property as if
it were their own</u>, the courts will also
disregard the corporate entity for the
protection of third persons.

<u>Id.</u> at 1209-10.

Additionally, the Maryland Court of Appeals noted that the

thrust of these circumstances embodies what is called the "alter

ego" doctrine.  <u>Id.</u> at 1210.  The doctrine is to be applied with

great caution and only in exceptional circumstances.  <u>Id.</u>

Although there appears to be no universal
rule as to the specific criteria that courts
will consider in determining whether to apply
the doctrine, Fletcher observes that some of
the factors commonly considered, when dealing
with a single corporation, are (1) whether
the corporation is inadequately capitalized,

15

> fails to observe corporate formalities, fails
> to issue stock or pay dividends, or operates
> without a profit, (2) whether there is
> commingling of corporate and personal assets,
> (3) whether there are non-functioning
> officers or directors, (4) whether the
> corporation is insolvent at the time of the
> transaction, and (5) the absence of corporate
> records. [William Meade Fletcher, Fletcher
> cyclopedia of the Law of Private Corporations
> § 41.30 at 625-28] These factors,
> occasionally articulated somewhat
> differently, have been applied in earlier
> Court of Special Appeals cases.  See Dixon v.
> Process Corp., 38 Md. App. 644, 653, 382 A.2d
> 893, 899 (1978); Travel Committee v. Pan Am,
> 91 Md. App. 123, 158-59, 603 A.2d 1301, 1318-
> 19 (1992); Residential Warranty v. Bancroft,
> 126 Md. App. 294, 307, 728 A.2d 783, 789
> (1999).  See also DeWitt Truck Brokers v. W.
> Ray Flemming Fruit Co., 540 F.2d 681 (4th
> Cir. 1976), cited by the Court of Special
> Appeals in Travel Committee and Iceland
> Telecom v. Information Systems and Net., 268
> F. Supp. 2d 585, 589-91 (D. Md. 2003).

Id. at 1210-11.

In De Witt v. Flemming Fruit Co., 540 F.2d 681 (4th Cir.
1976), the Fourth Circuit, in a case applying South Carolina law,
addressed the generally applicable principles pertinent to
determinations of whether to pierce the corporate veil.   The
court stated:

> [E]qually as well settled as is the principle
> that plain fraud is not a necessary
> prerequisite for piercing the corporate veil
> is the rule that the mere fact that all or
> almost all of the corporate stock is owned by
> one individual or a few individuals, will not
> afford sufficient grounds for disregarding

16

corporateness. But when substantial
ownership of all the stock of a corporation
in a single individual is combined with other
factors clearly supporting disregard of the
corporate fiction on grounds of fundamental
equity and fairness, courts have experienced
"little difficulty" and have shown no
hesitancy in applying what is described as
the "alter ego" or "instrumentality" theory
in order to cast aside the corporate shield
and to fasten liability on the individual
stockholder [citation omitted].

[I]n applying the "instrumentality" or "alter
ego" doctrine, the courts are concerned with
reality and not form, with how the
corporation operated and the individual
defendant's relationship to that operation.
. . . Other factors that are emphasized in
the application of the doctrine are failure
to observe corporate formalities, non-payment
of dividends, the insolvency of the debtor
corporation at the time, siphoning of funds
of the corporation by the dominant
stockholder, non-functioning of other
officers or directors, absence of corporate
records, and the fact that the corporation is
merely a facade for the operations of the
dominant stockholder or stockholders.

Id. at 684-86.

Applying these general principles, the Maryland Court of

Appeals found it appropriate to pierce the corporate veil in

Colandrea v. Colandrea, 401 A.2d 480 (Md. App. 1979). In

Colandrea, Mr. and Mrs. Colandrea incorporated Cortland Realty

Ltd. Id. at 481. A stock redemption agreement was executed when

the couple divorced whereby Mr. Colandrea agreed to sell his

stock in the company in exchange for promissory notes. Id. at

17

482.  Mrs. Colandrea retained complete control over the company.
Id. at 483.  Soon after the creation of the redemption agreement,
Mrs. Colandrea incorporated Cortland Ltd., which assumed all of
Cortland Realties' assets without its attendant liabilities.  Id.
at 482-83.  The promissory notes issued to Mr. Colandrea were
never honored.  Id.

The court pierced the corporate veil to hold Mrs. Colandrea
liable for the promissory notes because she caused the
corporation to enter into a stock agreement "with the deliberate
intention and purpose of cheating and defrauding [the plaintiff],
the other party to the contract." Id. at 486.  "The effect of all
these corporate machinations [was] obvious.  By it Mrs. Colandrea
was able to continue the profitable business of Cortland Realty,
Ltd. without its attendant obligations to Mr. Colandrea." Id. at
483.

In Colandrea, the Maryland court relied upon proof of common
law fraud to pierce the corporate veil.  See id. at 484.
However, proof of common law fraud is not always necessary to
permit piercing of the corporate veil.  See Anderson v. Abbott,
321 U.S. 349, 362 (1944), reh'g denied, 321 U.S. 804, (1944)
(stating that "[t]he cases of fraud make up part of that
exception [which allow the corporate veil to be pierced, citing
cases].  But they do not exhaust it."); see also De Witt, 540

18

F.2d at 684 ("[P]roof of plain fraud is not a necessary element in a finding to disregard the corporate entity.")

Even if a finding of fraud were necessary, the Court finds that the Trustee has proven by at least clear and convincing evidence that Gatrell utilized JCI to commit common law fraud. The common law fraud occurred in connection with the purchase of a residential lot for Gatrell, as discussed below, and also to affirmatively mislead Dirt Plus and other creditors with regard to the availability of Jollar funds to satisfy corporate obligations.

Accordingly, exercising all due reluctance to pierce the corporate veil, the court nevertheless finds it plainly appropriate to impose personal liability on Gatrell for the diversion of funds in the instant case.  The very purpose for creating JCI was to defraud Jollar's creditors by diverting corporate funds for the benefit of Gatrell and Sollars. Moreover, there was essentially a total disregard of corporate formalities.


B.   <u>The Residential Lot</u>

In 2001, Jollar was building homes on lots it owned in the Old South Country Club Subdivision in Lothian, Maryland.  On January 9, 2001, Jollar issued a Deed of Trust in favor of Severn

Savings Bank for $130,000 secured by two lots in the Running
Cedar Subdivision and three lots (including Lot 14, 620 Travelers
Court) in the Old South Subdivision.  Pl. Ex 3.  The Deed of
Trust permitted the Bank to grant partial releases on the Jollar
lots in return for payoffs specifically tied to each lot.  In
particular, the payoff for Lot 14 was $31,515.  Pl. Ex. 36.
However, due to an apparent title search error, the Bank was not
aware that its security interest in these lots was inferior to
the Judgment that Dirt Plus had obtained on October 13, 2000.

Jollar proceeded to sell several of the lots to customers
who, in return, employed Jollar as a general contractor to build
homes on those properties.  As the respective lot sales closed,
it was necessary to clear the title of the Dirt Plus Judgment.
Therefore, for each lot sale, Sollars got Dirt Plus to release
its lien[7] either by making an agreed payment to Dirt Plus or by
persuading Dirt Plus that there would be no net proceeds of the
sale payable to Jollar.

Gatrell and Sollars wished to build their personal residence
on 620 Travelers Court.  On or about August 14, 2001, Gatrell
signed a contract to purchase the property from Jollar for

---

[7]   Dirt Plus contends that Jollar and the respective
purchasers did not, effectively, release the Judgment from the
respective lots.  The matter of the effectiveness of the releases
is not now being resolved.

$200,000, an amount that all concerned appear to agree constituted fair market value for the property.  The sale was to close on September 15, 2000.  Pl. Ex. 29.  Sollars and Gatrell intended to use funds obtained from the converted Jollar checks to provide the cash needed for the purchase.  Thus, the plan was to make a down payment from funds in the JCI account that had been obtained from the converted Jollar checks and to borrow the balance from Severn Bank.

Sollars and Gatrell discovered that a transaction at a $200,000 purchase price would result in a settlement sheet reflecting a net payment to Jollar of $39,787.96.   Pl.'s Ex. 42. In such a transaction Dirt Plus would be able to, and would, receive $39,787.96 at closing.  Thus, Sollars and Gatrell knew that it would be necessary to pay this amount to Dirt Plus to obtain a release of its rights so as to enable the transfer of clear title in the property to Gatrell.  To avoid the need to make such a payment to Dirt Plus, Gatrell and Sollars engaged in a scheme to get Dirt Plus to release its lien for less than the full $39,787.96.

To carry out their scheme, Gatrell and Sollars created a fictitious contract dated September 4, 2001 purportedly selling the Property for $180,000 to Tomlinson Construction, Inc. ("TCI"), a company owned by a friend of Sollars.  Pl. Ex. 30.

21

The Court, evaluating the credibility of the witnesses, finds that the purported sale to TCI was not, and was not intended to be, a genuine transaction.  Rather, Tomlinson accommodated Sollars and Gatrell in their scheme.

The fact that Gatrell fully and knowingly participated in the fraud is clearly illustrated by her contemporaneous actions. Not only did Gatrell draft the purported TCI contract, but on September 6, 2001 (two days _after_ the TCI contract was purportedly entered into) she incorporated JCI and listed 620 Travelers Court, the address of the property that purportedly had been sold to TCI, as her address.  Pl.'s Ex. 11.  Of course, Gatrell knew that the TCI contract had no reality.

In furtherance of the scheme, on September 11 Sollars wrote DeCesaris stating:

> ...I have two lots remaining at Old South.
> One [620 Travelers Court] is under contract
> with no funds coming to Jollar; funds will be
> paying off existing loans.  The second lot
> has a construction loan and I could build on
> that lot, unless the lender calls the loan
> given the current situation.  (Emphasis
> added.)

Pl.'s Ex. 75.  Sollars and Gatrell then proceeded to defraud Dirt Plus into releasing its lien on the Property for less than the amount it would have obtained based upon the $200,000 actual sale price.  Pl.'s Ex. 6 & 37.

22

On October 8, 2001, Carol Wilson ("Wilson") of Atland Title faxed DeCesaris a draft settlement statement[8] for a purported sale to TCI for $200,000 that showed a payoff of $4,892.81 to both Dirt Plus and Severn, a total of $9,785.62.  Pl.'s Ex. 43. The Court finds Wilson's conduct and her alleged loss of the file to be highly suspicious.  However, inasmuch as neither she nor Atland Title was named as a party, it is not necessary to address the extent to which she and Atland may have knowingly participated in the fraud at issue.

DeCesaris thereafter spoke with Sollars and Wilson and was told that Severn would forego its payment so that Dirt Plus would get the full amount of cash generated for Jollar on the purported sale to TCI for $180,000.  Based on this understanding, Dirt Plus agreed to release its lien on Lot 14 in exchange for $9,785.62. Pl.'s Ex. 37.  On October 12, 2001, Sollars brought DeCesaris a check for $9,785.62 - paid with funds obtained through checks diverted from Jollar -  as payment of the amount that would supposedly have been payable to Dirt Plus in regard to the purported TCI transaction.  Id.  This check was accepted by DeCesaris and Dirt Plus provided the release.

---

[8]   Wilson testified that the Title company file was lost, somehow.

Having obtained the release from Dirt Plus based upon a purported sale to TCI for $180,000, Sollars and Gatrell then proceeded to close the sale of Lot 14 to Gatrell for a $200,000 purchase price.  The transaction at $200,000 generated $29,996.34 payable to Jollar and, again, the check was diverted to Gatrell's JCI account.

To "paper the file" so as to create the appearance of regularity, Tomlinson signed a document dated October 12, 2001 representing - falsely - that he had sold his right to purchase the Property to Gatrell.  Pl.'s Ex. 44.  Thus, if one were to believe the testimony of Tomlinson, Gatrell, and Sollars, Gatrell would have bought (presumably for some consideration) the right to buy the Property for $180,000, but nevertheless "paid" $200,000.

The Court finds beyond doubt that Tomlinson, Gatrell, and Sollars testified falsely about the matter, that there was never a genuine agreement for a sale to TCI for $180,000, and that Gatrell and Sollars[9] acted with the specific intent to defraud Dirt Plus.

---

[9]  Since Tomlinson is not a party to the case it is not necessary to address whether he contemporaneously acted with full knowledge of the scheme.  His testimony at trial, however, is found to have been knowingly false.

The Trustee, as assignee of Dirt Plus, sues on the Dirt Plus fraud claim against Sollars and Gatrell.  The Trustee also sues in his own right for rescission of the transaction as between Jollar and Gatrell.

        1.   <u>Common Law Fraud</u>

        (a)   <u>Liability</u>

In Maryland, to establish a common law fraud claim a Plaintiff must prove:

1.    that a false representation was made;

2.    that its falsity was either known to the speaker, or the misrepresentation was made with a reckless indifference to its truth;

3.    that it was made for the purpose of defrauding the plaintiff;

4.    that the plaintiff reasonably relied upon the misrepresentation; and

5.    that the plaintiff suffered damage directly resulting from the misrepresentation.

<u>Alleco</u>, 665 A.2d at 1047-48.  These elements must be proven by clear and convincing evidence.  <u>Gross v. Sussex, Inc.</u>, 630 A.2d 1156, 1161 (Md. 1993).

The Plaintiff has, beyond any reasonable doubt, <u>a</u> <u>fortiori</u> by clear and convincing evidence, proven each of the elements of its fraud claim against Gatrell and Sollars.

1.  <u>False representation</u>: Sollars falsely represented to Dirt Plus (DeCesaris) that Lot 14 was to be sold for $180,000.00 in a transaction that would yield only $9,785.62 to Jollar, Inc.

2.  <u>Known falsity</u>: Sollars knew full well that the price for Lot 14 he quoted Dirt Plus (DeCesaris) was false and that the sale would be to Gatrell for $200,000.00, yielding more than the represented amount for Jollar, Inc.

3.  <u>Purpose of fraud</u>: The false representation was made with the purpose of misleading Dirt Plus into relinquishing its lien for less than the amount it would recover based upon a $200,000 sale price.

4.  <u>Reasonable reliance</u>: Dirt Plus (DeCesaris) relied upon the false representation as evidenced by the release of its lien on the property.  Furthermore, Dirt Plus (DeCesaris) acted reasonably in doing so because Sollars made it appear that Jollar, Inc. had contracted with Tomlinson to sell the property for $180,000.  There was no reason to think that Gatrell would later pay $200,000 for the same property when she apparently bought Tomlinson's right to buy Lot 14 for $180,000.

5.  <u>Damages</u>: The damages sustained by Dirt Plus are equivalent to the difference between what it would have obtained based upon the actual $200,000 sale price ($39,781.96) and the amount it accepted based upon a purported $180,000 sale price ($9,785.62).  Pl.'s Ex. 43(b) and 42.  The actual amount of damages sustained is $29,996.34.


In sum, Dirt Plus was defrauded into releasing its lien on Lot 14 by the misrepresentation that the property was to be sold to Tomlinson for $180,000, and not to Gatrell for $200,000.

Gatrell and Sollars are joint and severally liable for the fraud as conspirators.  As discussed above, to establish a civil

conspiracy under Maryland law, a plaintiff must prove that (1) a combination of two or more persons agreed to accomplish an unlawful act; (2) that two or more persons committed the unlawful act; and (3) a causal connection between the unlawful act and the damages to Plaintiff exists.  <u>See</u> <u>Green</u>, 269 A.2d at 824. Plaintiff has proven, beyond doubt, that Gatrell and Sollars were co-conspirators.  They agreed to work together to accomplish the unlawful acts of defrauding Jollar creditors in various manners, including but not limited to the diversion of funds and defrauding Dirt Plus into relinquishing its lien on Lot 14 as discussed above.  Gatrell, as a conspirator with Sollars, is liable for tortious acts by herself and by Sollars within the scope of the conspiracy.  The aforesaid fraud on Dirt Plus was such a tortious act and, therefore, Gatrell is liable for the fraud jointly and severally with Sollars.


(b)   <u>Compensatory Damages</u>

As discussed above, if Dirt Plus had not been misled it would have obtained more than $9,785.62 for the release of its lien.  Accordingly, Dirt Plus has proven that it was damaged at least to the extent of the difference between the $39,781.96 payable based upon a $200,000 sale price and the $9,785.62 it received, a net difference of $29,996.34.

(c)   <u>Prejudgment Interest</u>

In Maryland law, the matter of prejudgment interest is left to the discretion of the jury, or the trial court when sitting without a jury.   <u>See</u> <u>I.W. Berman Properties v. Porter Bros., Inc.</u>, 276 Md. 1, 18-19, 344 A.2d 65 (1975).   The Court exercises its discretion to award prejudgment interest on the compensatory damages sustained by Dirt Plus from the sale of the property at issue, October 15, 2001, through December 15, 2005 so as to simplify the computation.

The rate of prejudgment interest is fixed.   As stated in <u>First Virginia Bank v. Settles</u>, 588 A.2d 803 (Md. 1991), "prejudgment interest which is awarded should be at the rate of 6% per annum."   Thus, simple interest at 6% per annum or .5% per month for 50 months will be 25%.

(d)   <u>Punitive Damages</u>

The purpose of awarding punitive damages is two-fold: to punish the defendant for egregiously bad conduct, and to deter the defendant and others from contemplating similar behavior. <u>Bowden v. Caldor</u>, 710 A.2d. 267, 276 (Md. 1998).   Punitive damages are granted only when the court finds by clear and convincing evidence that the defendant acted with actual malice. <u>Darcars v. Borzym</u>, 841 A.2d 828, 837 (Md. 2004).   The term

"actual malice" has been defined as "conduct of the defendant characterized by evil motive, intent to injure, ill will, or fraud." <u>Owens-Illinois v. Zenobia</u>, 601 A.2d 633, 652 (Md. 1992). With respect to awarding punitive damages based on fraud, "the defendant's actual knowledge of falsity, coupled with his intent to deceive the plaintiff by means of the false statement, constitutes the actual malice required to support an award of punitive damages." <u>Ellerin v. Fairfax Savings</u>, 652 A.2d 1117, 1126 (Md. 1995).

The Court finds that an award of punitive damages is proper with regard to the fraud perpetrated by Sollars and Gatrell. Both Gatrell and Sollars had actual knowledge of the false statements presented to Dirt Plus as to the purchase price of the property. Furthermore, both Gatrell and Sollars were co-conspirators in an entire fraudulent scheme purposefully designed to gain access to more funds by avoiding payment obligations to creditors. There was, without doubt, actual malice based on fraud. The conduct was egregious and warrants punishment. Moreover, a punitive damages award will serve to deter Sollars and Gatrell from further deceitful conduct, as well as others who may be tempted to engage in the same type of fraud.

The amount of punitive damages is within the discretion of the trier of fact, subject, of course, to appellate review. <u>See</u>

29

Bowden, 710 A.2d at 277.  The finder of fact should take into account such factors as the proportionality of the wrong, the defendant's ability to pay damages, the deterrence value of the award, the maximum criminal fine for comparable conduct, comparison to awards in somewhat comparable cases, the plaintiff's reasonable costs and expenses resulting from the defendant's malicious and tortious conduct, etc.  See id. at 278-285.

The Court, as fact finder, finds that punitive damages of $50,000 shall be awarded against Sollars and Gatrell, who shall be jointly and severally liable for the punitive damages. The amount is not disproportionate to the actual damages caused by the fraud on which compensatory damages have been awarded. Gatrell has ample assets from which to pay the award.  Sollars has ample potential to engage in future activities from which he can generate income adequate to pay the award.

### 2.  Fraudulent Conveyance

The Trustee seeks to rescind the sale of Lot 14 to Gatrell as a fraudulent conveyance.  Section 544 of the Bankruptcy Code grants the Trustee the power to avoid conveyances considered fraudulent under Section 15-207 of the Maryland Commercial Law Code.  Furthermore, under 11 U.S.C. § 550(a), "the trustee may

recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from - (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."

In the context of the instant claim, Gatrell acquired Lot 14 from Jollar in a transaction wherein there was a nominal sale price of $200,000.  However, because Gatrell effectively used Jollar's own funds to pay off Dirt Plus and for the down payment in regard to her purchase, the actual consideration she paid was less.  As discussed above, the sale of Lot 14 was effected by the use of diverted Jollar funds in the amount of $9,785.62 to pay Dirt Plus and an additional $36,061.25 paid at closing.  Pl.'s Ex. 43b.  Thus, the net price that Gatrell paid to Sollars in the transaction was $200,000 less $45,846.87 or $154,153.13. Inasmuch as there is no reason to find the fair market value of Lot 14 to be other than the $200,000 contract price, Gatrell did not provide adequate consideration for the property. Furthermore, the transaction yielded a net payment to Jollar that was also diverted from Jollar to Gatrell's JCI account.

Whether the Lot 14 transaction was a fraudulent transfer should be analyzed according to the usual factors considered under Maryland law.  See Berger, 263 A.2d at 510; Wellcraft

<u>Marine Corp.</u>, 550 A.2d at 379.  An examination of these factors leads to the conclusion that the transaction was a transfer in fraud of Jollar's creditors:

1. <u>Debtor Insolvency or Indebtedness</u> - Jollar was insolvent at the time of the transaction.

2. <u>Lack of Consideration</u> - As noted above, Gatrell did not provide adequate consideration for Lot 14 but, instead, used some $45,846.87 of Jollar's funds to reduce the effective price she paid below fair market value.

3. <u>Transferor/Transferee Relationship</u> - Jollar transferred the property to Gatrell, a previous shareholder who was also the current sole shareholder's long time companion and co-conspirator in the pertinent fraudulent conduct.

4. <u>Threat of Litigation</u> - Dirt Plus was actively pursuing legal collection remedies against Jollar and other creditors had additional claims.

5. <u>Secrecy</u> - The details of the transaction, in particular the use of diverted funds, were hidden from all of Jollar's creditors.

6. <u>Departure From Usual Business Methods</u> - The scheme, including the use of a phoney sales contract to mislead Dirt Plus, was highly unusual.

7. <u>Transfer of Estate</u> - The Lot 14 property was transferred from Jollar to Gatrell.

8. <u>Reservation of Benefit by Transferor</u> - Sollars, the sole shareholder of Jollar and co-conspirator with Gatrell, was able to keep the benefit of the property for himself and Gatrell.

9. <u>Retention by the Debtor of Possession</u> - Essentially, through the scheme Sollars kept possession of the Property with Gatrell and enabled the construction of a home for their use.

The circumstances surrounding the conveyance of Lot 14 to Gatrell present sufficient indicia of fraud to justify avoidance of the transfer as a fraudulent conveyance.  As a result, the property will revert back to the Jollar bankruptcy estate, subject to legitimate claims to the property as shall be determined by the bankruptcy judge.  Thus, the Bank and Gatrell (who may have paid some of the construction costs on Lot 14 with her own funds) may be able to establish that they have rights that should be recognized in regard to Lot 14.

C.   Bank's Deed of Trust

The Trustee claims that Severn Bank's deed of trust is avoidable pursuant to 11 U.S.C. § 544.  However, under 11 U.S.C. § 550(b)(1) the Trustee cannot recover from "a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided."  Id.

In the instant case, there is no doubt that the Bank's deed of trust was obtained in return for a loan it made to Gatrell in connection with the purchase, therefore establishing that adequate consideration was provided.  Also, the Trustee has not proven that the Bank was aware of fraudulent conduct by Sollars and Gatrell in regard to the transaction at issue.

33

The Trustee claims the Bank had actual knowledge that the Lot 14 transfer was voidable because it was served with a copy of Dirt Plus' law suit.  However, the bank's loan to Gatrell had already been approved prior to receipt of the complaint.  Furthermore, it appeared that the transaction was one for full value since the price was reasonable and the Bank was not aware that the "real" price paid was substantially reduced because of Gatrell's use of the seller's funds.  Accordingly, the Trustee has not established his claim against the Bank.

III. CONCLUSION

For the foregoing reasons:

1.   The Trustee has established a fraudulent conveyance of $458,000 from Jollar to JCI made for the purpose of defrauding creditors.

2.   Gatrell is personally liable[10] to Jollar's Estate for the $458,000 of diverted funds and may pursue claims in the Jollar bankruptcy proceedings for any payments made by Gatrell for Jollar.

3.   The Trustee has established, by clear and convincing evidence, the Dirt Plus common law fraud claim against Sollars and Gatrell.

   a.   Sollars and Gatrell fraudulently induced Dirt Plus to release its lien on Lot 14.

   b.   Sollars and Gatrell are jointly and severally liable to the Trustee for the sum of

---

[10]  Sollars and JCI are, also, jointly and severally liable.

34

$29,996.34 in compensatory damages plus
prejudgment interest from October 15, 2001.

c.    In addition, Sollars and Gatrell are jointly
      and severally liable to the Trustee for
      $50,000 in punitive damages.

4.    The Trustee has established that the transfer of
      Lot 14 from Jollar to Gatrell was a fraudulent
      conveyance.

      a.    The Trustee is entitled to avoid the
            transaction and recover the property for the
            Jollar Bankruptcy Estate.

      b.    The Trustee shall take the property subject
            to Severn Bank's lien and to such legitimate
            claims to the property as may be determined
            appropriate by the bankruptcy judge in the
            Jollar bankruptcy proceedings.

5.    Judgment shall be entered by separate Order.

SO DECIDED, on <u>Thursday, December 22, 2005</u>.


                    <u>/ s /</u>
                Marvin J. Garbis
            United States District Judge


35